[Civ. No. 34145. Second Dist., Div. Four. Apr. 16, 1970.]

SIMANK REALTY, INC., Plaintiff and Appellant, v.
VINCENT DeMARCO et al., Defendants and Respondents.

**612**

## COUNSEL

Starr & Waldorf and Henry P. Starr for Plaintiff and Appellant.

Heily & Blase, Neil D. Heily and Leonard Sacks for Defendants and Respondents.

## OPINION

**FILES, P. J.**—This action was brought by a real estate broker, a corporation, against the owners of a ranch for the breach of an exclusive listing agreement. In a trial without a jury defendants prevailed. Plaintiff is appealing from the judgment.

The facts of the case, as shown by the evidence which supports the findings of the trial court, will be stated first.

Prior to 1964 the defendants, Mr. and Mrs. DeMarco, were the owners of about 1,100 acres of ranch land in Ventura County. In September 1964 defendants listed their ranch for sale and, through plaintiff's efforts, sold 700 acres of it. Subsequently Russell Sellers, president of the plaintiff corporation, suggested that defendants give a longterm exclusive listing on the the remaining property. Sellers was aware that defendants were in financial distress and eager to sell. On November 11, 1965, the parties entered into the agreement which is the subject of this action. This contract, which was on a printed form supplied by a realty board, contained the following provisions, among others: "(1) I (We) agree to pay said REALTOR 10% of the selling price accepted by me (us) . . . in the event of the sale or exchange of said property by said REALTOR or any other source including myself, or if said property be leased, exchanged, transferred, conveyed or withdrawn from sale other than as herein provided . . . (4) It is agreed the seller will permit said REALTOR to show property at all reasonable times to prospective purchasers. Should seller cancel the listing before expiration or release the buyer without the consent of said REALTOR, or refuse to show property, or refuse to furnish termite report as herein provided, the commission shall become due and payable forthwith . . .

I (we) further agree:

(a) to direct all inquiries concerning the property to said REALTOR during the term of this authorization."

The selling price was $2,500 per acre. The listing was for six months, terminating at midnight, May 11, 1966. When the property failed to attract any interest, the defendants decided to reduce the asking price.

On January 18, 1966, defendants executed another printed form contract headed "Extension, Price Or Term Change Agreement." The blanks were filled in in such a way as to reflect a new asking price of $577,500, an average of $1,500 per acre for an estimated 385 acres. The printed form also contained the statement that the owners "do hereby request that this listing contract termination date be changed to ——————." In the space immediately below that language was the date, in typewriting, July 11, 1966.

The testimony as to the circumstances surrounding the execution of this document is in conflict. The trial court found that Mr. DeMarco's "attention was focused on reducing the purchase price for a quick sale. If his attention was in fact called to the inclusion of the extension of the date, this information did not register in Mr. DeMarco's memory and if he did once know it he forgot it." This finding is supported by the testimony of Mr. DeMarco given at trial.

Even with the reduction in price, plaintiff was unable to produce a single offer. Meanwhile, commencing in January 1966 another broker, Mr. Garion, tried to interest DeMarco in entering into a joint venture with a construction company to develop the property. DeMarco told Garion that the plaintiff had an exclusive listing on the property, and to work through plaintiff. DeMarco also told Garion he was more interested in selling than in participating in a joint venture. DeMarco told Sellers he had received such proposals (though without identifying the source) and Sellers advised him to " 'lay off of anything like that.' " In April 1966 Garion presented to DeMarco a specific proposal of Roger Saevig, owner of Oriole Construction Co., to develop the property. Garion said Saevig was not at all interested in buying the property, but "at least you know what Oriole will do in case it is not sold." DeMarco made it clear to both Garion and Saevig that he would make no binding commitment to them so long as plaintiff's listing was in effect.

On May 1 and May 11 DeMarco and plaintiff's president, Sellers, had telephone conversations, the exact tenor of which is in dispute. The version accepted by the trial court, based upon DeMarco's testimony, will be stated.

On May 1, 1966, DeMarco told Sellers of his difficulties with the bank which held a trust deed on the property, and that he was worried because plaintiff had made so little progress toward selling the property. The bank was intimating it would foreclose unless DeMarco would " 'start liquidating.' " He implored Sellers to bring any possible buyers to him. He said, "In the first place I want to know you have a buyer, and in the next place I want to see him because your time is very short, you only have a few days." Mr. Sellers did not contradict this latter statement. DeMarco told Sellers that if a buyer was not found within the listing period he would be forced to put the property into a joint venture as a means of escaping foreclosure.

In a telephone conversation on May 11, 1966, DeMarco told Sellers the listing was expiring and if no buyer was produced by midnight, DeMarco would put the property in a participation venture. Sellers "rather blew up about it." DeMarco said, "Russell, I have the exclusive here before me. Now, this exclusive expires today, May the 11th. Will you verify it?" Sellers said " 'Yes, it's on that date or near it.' " Sellers asked who the other parties to the participation deal were, and DeMarco gave the name and address of Saevig and the Oriole Construction Co. and told Sellers he could call them if he wished.

Later that day Sellers telephoned DeMarco, with one of his office employees listening on the branch telephone. Sellers asserted he had some prospects who had not seen the property. He said, " 'Did you mean to tell me I couldn't show the place?' " DeMarco answered, "No, Russ, there's

an expiration date here and it's May the 11th. . . . You give me a reason why you want to show this place for the purpose of selling it after the expiration point." Sellers gave no response to this.

On May 12 Garion presented to the DeMarcos a typewritten draft of an agreement with Roger A. Saevig. This draft was the outgrowth of discussions in April and May between the DeMarcos, Garion, Saevig, bank officials, and the DeMarcos' attorney. On May 12 the DeMarcos took the tendered draft to their attorney who suggested some changes, the changes were made, and the agreement was executed.

By this contract the DeMarcos agreed to sell to Saevig 386 acres at a price of $500,000, payable $2,000 on June 1, 1966, the balance in specified installments, without interest. Portions of the property were to be released when certain installments had been paid, and the DeMarcos were to receive one-half of any profits of Saevig by resale prior to development.

Garion, the broker who brought in Saevig, testified that he received no commission on the sale. His motivations, he said, were his friendship for the parties and his hope of earning commissions after Saevig developed the property.

The trial court found, among other things, the following:

Defendants did not withdraw the property from sale on or before May 11, 1966. Defendants gave plaintiff a full and fair opportunity to sell the property during the term of the listing as defendants understood it.

All of the negotiations between defendants and Saevig prior to May 12 were conditional upon the failure of plaintiff to produce a buyer prior to the expiration of the listing.

Sellers knew on May 11, 1966, that defendants were about to make some commitment which would expose them to "double liability," i.e., to their own buyer and to plaintiff for a commission; and that "The precise information as to when the listing agreement expired was readily available to Mr. Sellers. Mr. Sellers had the original of the document, and DeMarco had no copy."[1]

DeMarco had forgotten, if he ever knew, that the expiration date had been extended.

The court further found: "As of May 11, plaintiffs did not have, and their 'sub-agents' did not have, any interested prospective purchasers who were ready, willing or able to buy the subject property, or to whom they

---

[1]This finding does not go as far as the testimony of DeMarco, who said he had never received a copy of it.

desired in good faith to show the property, and their sole purpose in discussing alleged prospective purchasers on that date was to elicit a statement from DeMarco that could be construed as 'taking the property off the market' and thereby entitle plaintiffs to an automatic commission on any outside sale that might be negotiated by DeMarco."

The trial court concluded that defendants had not breached their agreement during the period expiring May 11, 1966, and that plaintiff was estopped to rely upon the agreement to extend the period. The court also, made findings of fact and conclusions of law in support of defendants' cross-complaint for reformation of the January 18, 1966, agreement, to eliminate the extension clause.

It is unnecessary to discuss the reformation because we are satisfied that the estoppel theory is supported by the record.

Many of the arguments appearing in plaintiff's brief on appeal relate to matters immaterial to the decision reached by the trial court. Plaintiff's contentions, so far as pertinent, will be discussed under two headings: (1) estoppel to rely on the extension agreement, and (2) plaintiff's rights under the original agreement expiring May 11, 1966.

### Estoppel

■ The elements of equitable estoppel are set forth in *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245]: ". . . (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citations.] ■ The existence of an estoppel is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the only one that can be reasonably drawn from the evidence."

■ These elements are all present in the evidence which supports the findings and judgment. Sellers knew about the extension agreement. On May 11, 1966, DeMarco did not. Sellers' statement " 'it's on that date or near it' " is reasonably construed as intended to reassure DeMarco that the expiration date was May 11 as DeMarco believed. DeMarco's reliance is clearly demonstrated by his conduct.

The damage, if the estoppel should not be applied, is obvious. Under the listing agreement, as extended, $50,000 became due from defendants to plaintiff upon their execution of the May 12, 1966, agreement with Saevig. Yet under that agreement plaintiff received no cash except the

$2,000 which Saevig was to pay on or before June 1. Defendants had no assurance that they would ever receive any more money from the transaction if Saevig elected not to complete his purchase (see Code Civ. Proc., § 580b; *Kistler* v. *Vasi* (1969) 71 Cal.2d 261, 263 [78 Cal.Rptr. 170, 455 P.2d 106]). To be bound both to Saevig and to plaintiff would have been an unmitigated disaster for defendants. The finding of reliance is the only reasonable inference.

### *Rights Under the Agreement Expiring May 11, 1966*

Plaintiff's contentions are, in substance, (a) that a commission was earned, and (b) that defendants breached their duty "to direct all inquiries" to plaintiff.

The agreement provides a commission will be paid in the event of a sale by any source, or a withdrawal of the property from sale within the period of exclusivity, "or if sold, leased or exchanged within three months after termination of this contract to any one with whom said REALTOR or any sub-agent had negotiations prior to the termination date, . . ."

There is no evidence that plaintiff had ever had any communication with Saevig or his company about this property. We reject out of hand plaintiff's theory that Saevig's broker, Garion, was plaintiff's sub-agent merely because he was another broker in the same community. Garion knew about plaintiff and its listing, but avoided dealing with plaintiff in this transaction. The trial court found that plaintiff placed a "For Sale" sign on the ranch which did "flag the attention of" Garion; but this does not militate against the finding that plaintiff did not produce Saevig as a buyer.

Plaintiff relies on cases such as *Leonard* v. *Fallas* (1959) 51 Cal.2d 649, 652 [335 P.2d 665], holding that where a broker shows property during the listing period to a prospective purchaser, and there is afterwards a sale to that prospect, the broker may be entitled to a commission even though he was not the procuring cause of the sale, if the listing agreement so provides. Such cases are not in point because, in the case at bench, plaintiff did not show the property to Saevig or negotiate with him at any time.

We have also reviewed the conduct of defendants in relation to their implied covenant of fair dealing (see, e.g., *Duffy* v. *Campbell* (1967) 250 Cal.App.2d 662, 667 [58 Cal.Rptr. 653]). "If the cooperation of the other party is necessary for successful performance of an obligation, a promise to *give that cooperation,* and *not to do anything which prevents* realization of the fruits of performance, will often be implied." (1 Witkin, Summary of Cal. Law (7th ed. 1960) Contracts, § 242, p. 271.) Nothing

in the conduct of defendants, as found by the trial court, would constitute a breach of such a covenant.

Defendants gave to plaintiff all possible cooperation during the period of the listing. They told Garion to deal with plaintiff, and they refused to commit themselves to Saevig until the expiration of the listing. Plaintiff had no way of forcing Garion and Saevig to deal with plaintiff. Defendants' negotiation with Garion and Saevig, on a purely contingent basis, did not in any way interfere with anything plaintiff might do to find a buyer. The record leaves no doubt that defendants accepted the speculative proposition of Saevig only as a desperate last resort, after they had lost all hope of obtaining anything through plaintiff's efforts.

■ The listing contained an express covenant "to direct all inquiries concerning the property to said REALTOR during the term of this authorization." Defendant's performance consisted only of telling Garion about the listing, and asking him to present his offer to plaintiff. A more generous performance would have included notifying plaintiff contemporaneously. The record shows DeMarco did tell Sellers in January that he had had some participation or joint venture proposals, and on May 1 DeMarco spoke of them again. On May 11 he gave Sellers the names of Garion and Oriole Construction Co.

If this constituted less than full performance of defendants' duty, their failure to disclose more was inconsequential under the circumstances. When DeMarco spoke to Sellers about the joint venture proposals, the latter advised against considering them. Sellers did not ask further details. When the subject was discussed again on May 1, Sellers showed no interest in knowing who was proposing a participation deal.

Garion and Saevig likewise made it clear they did not care to deal with plaintiff. Saevig was interested in the property only if he could get it without any substantial cash investment. The court asked Saevig, "What is the maximum payment that you would have made down on this property?" Saevig answered, "The one I made."

Against this background defendants' failure to identify Saevig and Garion to plaintiff in January 1966 was not a material breach of the agreement. Nor was it a cause of any damage to plaintiff.

The judgment is affirmed.

Kingsley, J., and Dunn, J., concurred.